(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BARBER ET AL. *v.* THOMAS, WARDEN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–5201. Argued March 30, 2010—Decided June 7, 2010

The federal sentencing statute at issue provides that a "prisoner . . . serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of [that] sentence . . . of up to 54 days at the end of each year" subject to the Bureau of Prison's (BOP) "determination . . . that, during that year, the prisoner" has behaved in an exemplary fashion. 18 U. S. C. §3624(b)(1). Credit "for the last year or portion of a year of the term of imprisonment [is] prorated . . . ." *Ibid.* The BOP applies this statute using a methodology that awards 54 days of credit at the end of each year the prisoner serves and sets those days to the side. When the difference between the time remaining in the sentence and the amount of accumulated credit is less than one year, the BOP awards a prorated amount of credit for that final year proportional to the awards in other years.

Petitioners claim that the BOP's calculation method is unlawful because §3624(b)(1) requires a calculation based on the length of the term of imprisonment imposed by the sentencing judge, not the length of time that the prisoner actually serves. The District Court rejected this challenge in each of petitioner's cases, and the Ninth Circuit affirmed.

*Held:* Because the BOP's method for calculating good time credit reflects the most natural reading of the statute, it is lawful. Pp. 5–17.

(a) The statute's language and purpose, taken together, support the BOP's method. That method tracks §3624(b)'s language by providing a prisoner a maximum credit of 54 days for each full year of imprisonment and a proportionally adjusted amount of credit for any additional time served that is less than a full year. As §3624(b) directs, the BOP awards the credit "at the end of each year" of imprisonment. Petitioners' approach cannot be reconciled with the statute. Because

it awards credit for the sentence imposed, regardless of how much time is actually served, a prisoner could receive credit for a year that he does not spend in prison. Moreover the calculation of credit for such a year would *not* be made "at the end of" that year. Nor could the BOP determine whether the prisoner had exemplary behavior "during that year." This language did not find its way into the statute by accident. The differences between the prior provision (repealed in 1984)—which granted the prisoner a deduction at the outset of his sentence, subject to forfeiture for breaking prison rules—and the present statute—under which "credit" is "earned" "at the end of" the year based on an evaluation of behavior "during that year"—show an intent to move from a prospective entitlement to a retrospective award. The BOP's method also furthers the basic purpose of the statute. Section 3624 was part of the comprehensive Sentencing Reform Act of 1984, which sought to achieve both increased sentencing uniformity and greater honesty by "mak[ing] all sentences basically determinate." *Mistretta* v. *United States*, 488 U. S. 361, 367. Thereafter, the sentence the judge imposed would be the one the offender actually served, with a sole statutory exception for good time credits. *Ibid.* Section 3624(b) states the reason for the exception: to provide an incentive for prisoners to "compl[y] with institutional disciplinary regulations." The exception is limited and tailored to its purpose—credit is earned at the end of the year after compliance with institutional rules is demonstrated and thereby rewards and reinforces a readily identifiable period of good behavior. The BOP's approach furthers §3624's objectives by tying the award directly to good behavior during the preceding year. In contrast, petitioners' approach would allow a prisoner to earn credit for both the portion of his sentence that he served and the portion offset with earned credit, which would loosen the statute's connection between good behavior and the good time award. Pp. 5–8.

(b) Arguments to the contrary are unconvincing. Context indicates that the phrase "term of imprisonment" as used in the portion of §3624(b) at issue here refers to prison time actually served not, as petitioners contend, to the sentence imposed by the judge. Petitioners' reliance on legislative history is misplaced. A U. S. Sentencing Commission Supplementary Report is not helpful to them either, because there is no indication that the Commission, in that report or in the Guidelines themselves, considered or referred to the particular question whether to base good time credit on time served or the sentence imposed. Nor, in light of the statute's text, structure, history, and purpose, is this a case in which there is a "grievous ambiguity or uncertainty in the statute," *Muscarello* v. *United States*, 524 U. S. 125, 139, permitting application of the rule of lenity. Because the BOP's

Syllabus

calculation system applies the statute as its language is most natu-rally read, and in accordance with the statute's basic purpose, this Court need not determine the extent to which Congress has granted the BOP authority to interpret the statute more broadly, or differ-ently than it has done here. Cf. *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844–845. And because the BOP's approach reflects the statute's most natural reading and is the most consistent with its purpose, it is also preferable to the dis-sent's alternative interpretation. Pp. 8–17.

Affirmed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, ALITO, and SOTOMAYOR, JJ., joined. KEN-NEDY, J., filed a dissenting opinion in which STEVENS and GINSBURG, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–5201

_____

## MICHAEL GARY BARBER, ET AL., PETITIONERS *v.* J. E. THOMAS, WARDEN

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 7, 2010]

JUSTICE BREYER delivered the opinion of the Court.

Federal sentencing law permits federal prison authorities to award prisoners credit against prison time as a reward for good behavior. 18 U. S. C. §3624(b). Petitioners, two federal prisoners, challenge the method that the Federal Bureau of Prisons uses for calculating this "good time credit." We conclude that the Bureau's method reflects the most natural reading of the statute, and we reject petitioners' legal challenge.

## I

### A

A federal sentencing statute provides:

"[A] prisoner who is serving a term of imprisonment of more than 1 year . . . may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's term of imprisonment, beginning at the end of the first year of the term . . . . [C]redit for the last year or portion of a year of the term of imprisonment shall be prorated and credited within the last six weeks of the sentence." §3624(b)(1).

The Bureau of Prisons (BOP) applies this statute using a methodology that petitioners in this case challenge as unlawful. In order to explain the BOP method, we shall use a simplified example that captures its essential elements. The unsimplified calculations described by the BOP in its policy statement, see App. 96–100, will reach approximately the same results as, and are essentially the mathematical equivalent of, the simplified system we describe (there may be other ways to describe the calculation as well). To the extent that there are any differences between the methodology employed by the BOP and that reflected in our example, they are of no consequence to the resolution of petitioners' challenge and are therefore not before us. Similarly, although petitioners committed their crimes before the current version of §3624 was enacted and are therefore subject to a previous version that differed slightly in certain details, see 18 U. S. C. §3624 (1988 ed.), the differences between the two versions are immaterial to the questions presented by this case. The parties refer to the current version as the relevant provision of law, see Brief for Petitioners 2–3; Brief for Respondent 8, n. 2, and we shall do the same.

In our example we shall imagine a prisoner who has received a sentence of 10 years' imprisonment. We shall assume that his behavior throughout his confinement is exemplary and that prison authorities will consequently consider him to merit the maximum good time credit that the statute will allow. And we shall ignore leap years.

Thus, at the end of the first year (Year 1) that prisoner would earn the statute's maximum credit of 54 days. The relevant official (whom we shall call the "good time calculator") would note that fact and, in effect, preliminarily put the 54 days to the side. At the end of Year 2 the prisoner would earn an additional 54 days of good time credit. The good time calculator would add this 54 days to the first 54 days, note the provisional total of 108 days, and

again put the 108 days' credit to the side. By the end of Year 8, the prisoner would have earned a total of 432 days of good time credit (8 years times 54 days). At that time, the good time calculator would note that the difference between the time remaining in the sentence (2 years, or 730 days) and the amount of accumulated good time credit (432 days) is less than 1 year (730 minus 432 equals 298 days, which is less than 365). The 432 days of good time credit that the prisoner has earned by the end of Year 8 are sufficient to wipe out all of the last year of the 10-year prison term and to shorten the prisoner's 9th year of imprisonment by 67 days.

Year 9 of the sentence will consequently become the prisoner's last year of imprisonment. Further, because the prisoner has already earned 67 days of credit against that year (432 days already earned minus 365 days applied to Year 10 leaves 67 days to apply to Year 9), the prisoner will have no more than 298 days left to serve in Year 9. Now the good time calculator will have to work out just how much good time the prisoner can earn, and credit against, these remaining 298 days.

As we said, the statute provides that "good time" for this "last year or portion" thereof shall be "prorated." Thus, the good time calculator must divide the 298 days into two parts: (1) days that the prisoner will have to serve in prison, and (2) credit for good behavior the prisoner will earn during the days served in Year 9. In other words, the number of days to be served in Year 9 plus the number of good time credit days earned will be equal to the number of days left in the sentence, namely, 298. And to keep the award of credit in the last year proportional to awards in other years, the ratio of these two parts of Year 9 (*i.e.*, the number of good time days divided by the number of days served) must be 54/365, the same ratio that the BOP applies to full years served. We can use some elementary algebra, described in the Appendix, *infra,* to work out the

rest.  The result is that if the prisoner serves 260 days, he can earn an additional 38 days of credit for good behavior. That is to say, of the 298 days remaining in his sentence, the prisoner will have to serve 260 days in confinement, after which point, his sentence will be fully accounted for (given the additional 38 days' credit earned), and he will be released.  In sum, a prisoner subject to a 10-year (3,650-day) sentence who earns the maximum number of days the statute permits will serve 3,180 days in confinement and receive 470 days of "good time" credit, about 15% of the prison time actually served.

## B

In this case petitioners claim that the BOP's calculation method is unlawful.  They say that §3624(b)(1) (2006 ed.) requires a straightforward calculation based upon the length of the term of imprisonment that the sentencing judge imposes, not the length of time that the prisoner actually serves.  Thus, if a sentencing judge imposes a prison term of 10 years (as in our example), then, in petitioners' view, the statute permits a maximum good time award of 540 days (10 years times 54 days), not the 470 days that the method described above would allow.  And if the judge imposes a prison term of 10 years and 6 months, then the statute permits 567 days (540 days for the 10 years plus 27 days for the extra 6 months), not the 494 days that the method above would allow.  According to petitioners, the BOP's method causes model prisoners to lose seven days of good time credit per year of imprisonment, and because their sentences are fairly long (one, Michael Barber, was sentenced to 26 years and 8 months; the other, Tahir Jihad-Black, was sentenced to 21 years and 10 months), the difference in their cases amounts to several months of additional prison time.

The District Court in each of these cases rejected the prisoner's challenge.  Civ. No. 08–226 MO (D Ore., Oct. 27,

2008), App. 13; *Jihad-Black* v. *Thomas*, Civ. No. 08–227 MO (D Ore., Oct. 27, 2008), App. 25. And in each instance the Court of Appeals affirmed the District Court. *Tablada* v. *Thomas*, No. 07–35538 (CA9, Apr. 10, 2009), App. 11; see also *Tablada* v. *Thomas*, 533 F. 3d 800 (CA9 2008). Because the BOP's administration of good time credits affects the interests of a large number of federal prisoners, we granted the consolidated petition for certiorari to consider petitioners' challenge.

II

Having now considered petitioners' arguments, we conclude that that we must reject their legal challenge. The statute's language and its purpose, taken together, convince us that the BOP's calculation method is lawful. For one thing, that method tracks the language of §3624(b). That provision says that a prisoner (serving a sentence of imprisonment of more than a year and less than life) "may receive credit . . . of up to 54 days *at the end of each year*" subject to the "determination by the Bureau of Prisons that, *during that year,* the prisoner" has behaved in an exemplary fashion. *Ibid.* (emphasis added). And it says that credit for the "last year or portion of a year . . . shall be prorated and credited within the last six weeks of the sentence." *Ibid.* As the example in Part I makes clear, the BOP's interpretation provides a prisoner entitled to a maximum annual credit with 54 days of good time credit for each full year of imprisonment that he serves and a proportionally adjusted amount of credit for any additional time served that is less than a full year. And, as §3624(b) directs, the BOP awards the credit *at the end of* each year of imprisonment (except, of course, for Year 9, which is subject to the statute's special instruction requiring proration and crediting during the last six weeks of the sentence).

We are unable similarly to reconcile petitioners' ap-

proach with the statute. Their system awards credit for the sentence imposed, regardless of how much time is actually served. Thus, a prisoner under petitioners' system could receive 54 days of credit for Year 10 despite the fact that he would be released after less than 8½ years in prison. The good time calculation for Year 10 would *not* be made *"at the end of"* Year 10 (nor within the last six weeks of a sentence ending during that year). Neither could the BOP determine whether the prisoner had behaved in exemplary fashion *"during that year."* 18 U. S. C. §3624(b) (emphasis added); see also *White* v. *Scibana*, 390 F. 3d 997, 1001 (CA7 2004) ("The Bureau cannot evaluate a prisoner's behavior and award credit for good conduct if the prisoner is not still in prison"); cf. *McGinnis* v. *Royster*, 410 U. S. 263, 273 (1973) ("Where there is no evaluation by state officials and little or no rehabilitative participation for anyone to evaluate, there is a rational justification for declining to give good-time credit").

We cannot say that this language ("at the end of," "during *that* year") found its way into the statute by accident. Under the previous good time provision, a prisoner was "entitled to a deduction from the term of his sentence beginning with the day on which the sentence commences to run." 18 U. S. C. §4161 (1982 ed.) (repealed 1984). This deduction, granted at the outset of a prisoner's sentence, was then made subject to forfeiture if the prisoner "commit[ted] any offense or violate[d] the rules of the institution." §4165 (repealed 1984). The present statute, §3624 (2006 ed.), in contrast, creates a system under which "credit" is "earned" "at the end of" the year based on an evaluation of behavior "during that year." We agree with the Government that "[t]he textual differences between the two statutes reveal a purpose to move from a system of prospective entitlement to a system of retrospective award." Brief for Respondent 33; see also *White*, *supra*, at 1002, n. 3.

For another thing, the BOP's method better furthers the statute's basic purpose. The "good time" provision in §3624 is part of the Sentencing Reform Act of 1984, 98 Stat. 1987, 18 U. S. C. §3551 *et seq.*, 28 U. S. C. §§991–998, a comprehensive law that reformed federal sentencing practice and directed the newly created United States Sentencing Commission "to devise guidelines to be used for sentencing" in district courts, *Mistretta* v. *United States*, 488 U. S. 361, 367 (1989). Under the previous regime, the United States Parole Commission, "as a general rule, [could] conditionally release a prisoner any time after he serve[d] one-third of the judicially fixed term." *United States* v. *Grayson*, 438 U. S. 41, 47 (1978). If, for example, a judge imposed a prison term of 15 years, the Parole Commission might have released the prisoner after only 5 years. And it routinely did so. See United States Sentencing Commission, Guidelines Manual §1A3, p. s., p. 1.2 (Oct. 1987) (USSG) ("[D]efendants often serv[ed] only about one-third of the sentence handed down by the court"). The result was "confusion and implicit deception." *Ibid.* With the Sentencing Reform Act, Congress sought to achieve both increased sentencing uniformity and greater honesty by "mak[ing] all sentences basically determinate," *Mistretta, supra*, at 367. See USSG §1A3, p. s., at 1.2 (statutory objectives included "honesty in sentencing," "uniformity," and "proportionality" (emphasis deleted)).

Thereafter, the sentence the judge imposed would be the sentence the offender actually served, *with a sole statutory exception for good time credits. Mistretta, supra*, at 367 (a "prisoner is to be released at the completion of his sentence reduced only by any credit earned by good behavior while in custody" (citing §3624(b)). The reason for this exception is provided in §3624(b) itself: to provide an incentive for prisoners to "compl[y] with institutional disciplinary regulations." The good time exception is limited (to 54 days per year) and tailored to its purpose—

credit is earned at the end of the year after compliance with institutional rules is demonstrated and thereby rewards and reinforces a readily identifiable period of good behavior.

The BOP's approach furthers the objective of §3624. It ties the award of good time credits directly to good behavior during the preceding year of imprisonment. By contrast, petitioners' approach, insofar is it would award up to 54 days per year of time *sentenced* as opposed to time *served*, allows a prisoner to earn credit for both the portion of his sentence that he serves and the portion of his sentence that he offsets with earned good time credit. In other words, petitioners argue that the BOP should award good time credit not only for the days a prisoner spends in prison and behaves appropriately, but also for days that he will not spend in prison at all, such as Year 10 in our example. By doing so, it loosens the statute's connection between good behavior and the award of good time and transforms the nature of the exception to the basic sentence-imposed-is-sentence-served rule. And to that extent, it is inconsistent with the statute's basic purpose.

## III
### A

We are not convinced by petitioners' several arguments against the BOP's methodology. First, petitioners point to the statement in §3624(b) that a prisoner "may receive credit . . . at the end of each year of the prisoner's *term of imprisonment.*" (Emphasis added.) The words "term of imprisonment," they say, must refer to the years of the term that the sentencing judge imposed (10 years in our example), not the (less-than-10) years of the term that the prisoner actually served once good time credits were taken into account. After all, the very first phrase of that provision makes eligible for good time credits "a prisoner who is serving a *term of imprisonment* of more than 1 year other

than a *term of imprisonment* for the duration of the prisoner's life." *Ibid.* (emphasis added; footnote omitted). The words "term of imprisonment" in this phrase almost certainly refer to the sentence imposed, not to the time actually served (otherwise prisoners sentenced to a year and a day would become ineligible for credit as soon as they earned it). And, as petitioners emphasize, we have recognized a "presumption that a given term is used to mean the same thing throughout a statute," *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994).

The problem for petitioners, however, is that this presumption is not absolute. It yields readily to indications that the same phrase used in different parts of the same statute means different things, particularly where the phrase is one that speakers can easily use in different ways without risk of confusion. *Atlantic Cleaners & Dyers, Inc.* v. *United States*, 286 U. S. 427, 433 (1932); *General Dynamics Land Systems, Inc.* v. *Cline*, 540 U. S. 581, 595–596 (2004). See, *e.g., id.,* at 596–597 ("age" has different meanings in the Age Discrimination in Employment Act of 1967); *United States* v. *Cleveland Indians Baseball Co.*, 532 U. S. 200, 213 (2001) (same for "'wages paid'" in the Internal Revenue Code); *Robinson* v. *Shell Oil Co.*, 519 U. S. 337, 343–344 (1997) (same for "employee" in Title VII of the Civil Rights Act of 1964).

The phrase "term of imprisonment" is just such a phrase. It can refer to the sentence that the judge imposes, see, *e.g.,* §3624(a) ("A prisoner shall be released" at the end of "the prisoner's term of imprisonment, less any time credited" for good behavior), but it also can refer to the time that the prisoner actually serves. Thus, §3624(d) of the statute before us requires BOP to "furnish [a] prisoner with . . . suitable clothing[,] . . . money, . . . and . . . transportation" "[u]pon the release of [the] prisoner on the expiration of the *prisoner's term of imprisonment*." (Emphasis added.) The statute here means to assure that the

prisoner is provided with these necessities at the time of his actual release from prison (sometime during Year 9 in our example), not at the end of the term that the judge imposed (which would be over a year later). Since the statute uses the same phrase "term of imprisonment" in two different ways, the presumption cannot help petitioners here. And, for the reasons we have given, see Part II, *supra*, context here indicates that the particular instance of the phrase "term of imprisonment" at issue refers to prison time actually served rather than the sentence imposed by the judge.

Second, petitioners seek to draw support from the statute's legislative history. But those who consider legislative history significant cannot find that history helpful to petitioners here. Petitioners point, for example, to a statement in the Senate Report accompanying the Sentencing Reform Act, which says that the "method of calculation" of good time "will be considerably less complicated than under current law in many respects," and that "credit toward early release is earned at a steady and easily determined rate that will have an obvious impact on the prisoner's release date." S. Rep. No. 98–225, p. 146–147 (1983); see Brief for Petitioners 31–32. But these statements are consistent with the BOP's interpretation of the statute. Its method, as we understand it, is not particularly difficult to apply and it is certainly less complex than prior law, which provided for the accumulation of two different kinds of good time credit (general and industrial), calculated in different manners (prospectively and retrospectively), and awarded at different rates, depending on the length of sentence imposed on the prisoner (5 to 10 days per month for general) or the year of employment (3 or 5 days per month for industrial). See 18 U. S. C. §§4161, 4162 (1982 ed.).

Petitioners also point to various statements contained in the Act's Conference Report and made by individual legis-

lators that describe good time credit as providing sentence reductions of 15%. See Brief for Petitioners 34–36 (citing, *e.g.*, H. R. Conf. Rep. No. 98–1159, p. 415 (1984); 131 Cong. Rec. 488 (1985) (remarks of Rep. Hamilton)). But there is nothing in the context of these statements to suggest that they amounted to anything other than rough approximations or that they were made with the present controversy in mind. See, *e.g.,* H. R. Conf. Rep. No. 98–1159, at 415 (noting simply that an increase in the amount of maximum annual credit from 36 days to 54 days "increases 'good time' that accrues from 10 percent to 15 percent"); 131 Cong. Rec. 488 (1985) (statement of Rep. Hamilton) ("Under [pre-Sentencing Reform Act] law, about 80% of all criminals are paroled after serving one third of their time. Now sentences will be reduced only 15% for good behavior"). And whatever interpretive force one attaches to legislative history, the Court normally gives little weight to statements, such as those of the individual legislators, made *after* the bill in question has become law. See, *e.g., Heintz* v. *Jenkins*, 514 U. S. 291, 298 (1995).

Third, petitioners rely on a statement in the United States Sentencing Commission's Supplementary Report on the Initial Sentencing Guidelines and Policy Statements issued in 1987 (hereinafter Supplementary Report). In that Report, the Commission summarized its analysis of recent pre-Guidelines sentencing practice, which it had used to help draft the Guidelines. The results of the analysis were presented in a table that permits comparison of the likely prison-time consequences of the new Guidelines with prison time actually served under pre-Guidelines practice (specifically, by identifying the Guidelines "offense level that is closest to the average time . . . served by first-time offenders" convicted of a particular crime, Supplementary Report 23). Because the Guidelines "refer to sentences prior to the awarding of good time" (*i.e.*, because a Guidelines sentence of, say, 30 months' impris-

onment does not necessarily mean that the offender will serve the entire 30 months in prison), the Commission adjusted the average time served "by dividing by 0.85 good time when the term exceeded 12 months." *Ibid.* This adjustment, the Commission explained, "made sentences in the [t]able comparable with those in the guidelines." *Ibid.*

Pointing to this adjustment and a reference in later editions of the Guidelines to a potential credit of "approximately fifteen percent for good behavior," see, *e.g.,* USSG §1A3, p. s., at 3 (Nov. 2009), petitioners maintain that the Commission set its Guideline ranges with the expectation that well-behaved prisoners would receive good time credit of up to 15% of the sentence imposed, not 15% of the time actually served. They add that, in setting the Guidelines ranges in this way, the Commission exercised congressionally delegated power to interpret the Sentencing Reform Act, see *Mistretta*, 488 U. S., at 371–379 (approving Congress' delegation of the power to promulgate sentencing guidelines), and that as long as that interpretation is reasonable, courts must defer to it. See *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843–844 (1984).

Again, however, we can find no indication that the Commission, in writing its Supplementary Report or in the Guidelines themselves, considered or referred to the particular question here before us, that is whether good time credit is to be based on time served or the sentence imposed. The Guidelines Manual itself, a more authoritative account of the Commission's interpretive views than the Supplementary Report, says nothing directly on that subject. Moreover, with respect to comparisons between Guidelines sentences and pre-Guidelines practice, the original 1987 Manual cautioned that the Guidelines did not "simply cop[y] estimates of existing practice as revealed by the data," but rather "departed from the data at

different points for various important reasons." USSG §1A3, p. s., at 1.4; see also *id.,* §1A4(g), p. s., at 1.11 (while "Guideline sentences in many instances will *approximate* existing [*i.e.*, pre-Guidelines] practice," the Commission did "not conside[r] itself bound by existing sentencing practice" (emphasis added)). Because the Commission has expressed no view on the question before us, we need not decide whether it would be entitled to deference had it done so. If it turns out that the calculation of good time credit based on prison time served rather than the sentence imposed produces results that are more severe than the Commission finds appropriate, the Commission remains free to adjust sentencing levels accordingly. See *id.,* §1A2, at 1.2 (acknowledging that "the guideline-writing process is evolutionary" and that the Commission functions "as a permanent agency to monitor sentencing practices in the federal courts throughout the nation").

Fourth, petitioners ask us to invoke the rule of lenity and construe §3624 (2006 ed.) in their favor, that is, in a way that will maximize the amount of available good time credit. We may assume for present purposes that §3624(b) can be construed as imposing a criminal penalty. See *Bifulco* v. *United States*, 447 U. S. 381, 387 (1980) (rule of lenity applies to "interpretations of . . . the penalties" imposed by "criminal prohibitions"); but see *Sash* v. *Zenk*, 428 F. 3d 132, 134 (CA2 2005) (Sotomayor, J.) (holding that §3624(b) is not a criminal statute for the purposes of the rule of lenity). Even so, the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a "grievous ambiguity or uncertainty in the statute," *Muscarello* v. *United States*, 524 U. S. 125, 139 (1998) (internal quotation marks omitted), such that the Court must simply "'guess as to what Congress intended.'" *Bifulco, supra*, at 387 (quoting *Ladner* v. *United States*, 358 U. S. 169, 178 (1958)). See *United States* v. *Hayes*,

555 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 13); *United States* v. *R. L. C.*, 503 U. S. 291, 305–306 (1992) (plurality opinion). Having so considered the statute, we do not believe that there remains a "grievous ambiguity or uncertainty" in the statutory provision before us. Nor need we now simply "guess" what the statute means.

Finally, we note that petitioners urge us not to defer to the BOP's implementation of §3624(b). In our view, the BOP's calculation system applies that statute as its language is most naturally read, and in accordance with what that language makes clear is its basic purpose. No one doubts that the BOP has the legal power to implement the statute in accordance with its language and purposes; hence we need not determine the extent to which Congress has granted the BOP authority to interpret the statute more broadly, or differently than it has done here. Cf. *Chevron*, *supra*, at 844–845.

B

Acknowledging that petitioners' arguments cannot carry the day, the dissent has proposed a "third possibility," *post,* at 2 (opinion of KENNEDY, J.), not raised by either party nor, to our knowledge, used elsewhere in the Criminal Code. The dissent reads the statutory phrase "term of imprisonment" to refer to "the administrative period along which progress toward eventual freedom is marked." *Post*, at 3. It derives from this reading the following method of calculation as applied to our 10-year example. First, "[t]he sentence is divided into 10 365-day segments." *Ibid.* At the end of the first segment, a prisoner may receive up to 54 days of credit for good behavior. These credits immediately "go toward completion of the next year" so that the prisoner need only serve "another 311 days behind bars before the second year of his term of imprisonment is at an end." *Ibid.* This process repeats itself until the "10th segment," in which a prisoner receives an unspecified

"credit in a prorated amount." *Ibid.* In the end, the prisoner will have served 10 "administrative segments," *ibid.*, collectively comprising 3,117 days in prison and 533 days of credit.

The dissent claims "[r]eading 'term of imprisonment' this way is consistent with all parts of the statute." *Post,* at 4. We see at least four problems. First, the opening sentence of §3624(a) instructs that "[a] prisoner shall be released" upon "the expiration of the prisoner's term of imprisonment, less any time credited" for good behavior. But if a prisoner's "term of imprisonment" is the "period that a prisoner must complete in order to earn his freedom," *post,* at 4, and it is "accounted for through a combination of prison time and credits," *post,* at 3, then a prisoner should be released exactly at the end of his term of imprisonment (without any further adjustment). Because the dissent's approach would require us to read words out of the statute, or give prisoners double credit, its definition cannot be used here.

Second, §3624(b)(1) tells us that a prisoner receives credit "at the end of each year" based on behavior "during that year." Under the dissent's approach, however, a prisoner may receive credit at the end of each "administrative segmen[t]" presumably based on his behavior during that segment. And because an "administrative segmen[t]" is made up of some "combination of service and credits," *post*, at 4, each one lasts less than a calendar year. We do not see how a system in which "a prisoner may complete a particular year of his term in less than 365 calendar days," *ibid.*, and receive full good time credit for doing so, can possibly represent the most natural reading of this statutory language. Nor do we know, because the BOP has not had an opportunity to tell us, whether a system in which a "year" lasts anywhere from 311 to 365 calendar days (and in which the "years" of a single prisoner's sentence may all be of different lengths), is easily administrable. (We doubt

that this system will be more comprehensible to prisoners than one, like the BOP's, that provides credit for actual years.)

Third, under the dissent's approach, credit is earned at different rates during a single sentence. For the first "administrative segmen[t]" in its 10-year example, the prisoner serves 365 days and earns 54 days of credit. The ratio of credit earned to days served is .148. For the second "administrative segmen[t]," the prisoner serves 311 days and earns 54 days of credit. This time, the ratio of credit earned to days served is .174. (For the last "administrative segmen[t]," the dissent tells us the prisoner will receive "credit in a prorated amount," but it does not tell us which ratio should be used for the proration. *Post*, at 3.) The use of different rates finds no support in the statute. The dissent objects that the statute "prescribes no particular rate," *post*, at 7, but in fact it does—54 days of credit per year of good behavior—and it further requires that credit for the last year be "prorated" using the same proportion. Moreover, the dissent's application of different rates leads to odd results. For example, a model prisoner sentenced on two separate 5-year terms (with a break in between) will serve a different number of days from one sentenced to a single 10-year term. How can this be if both prisoners are earning 54 days of credit for each of their 10 years in prison?

Fourth, §3624(b)(2) provides that good time credit "shall vest on the date the prisoner is released from custody." (This provision does not apply to prisoners, like petitioners, who committed their offenses before it was amended in 1996, but the dissent plainly intends for its approach to apply more broadly. See *post*, at 9 (noting the effect on "almost 200,000 federal prisoners").) Yet under the dissent's approach, credit appears to vest immediately. See *post*, at 3 (Days of credit for the first year "go toward completion of the next year" so that the prisoner "would

need another 311 days behind bars before the second year of his term of imprisonment is at an end"). And if it does not, then the situation quickly becomes complicated. What happens if, say, on the last day of the 10th "administrative segmen[t]" (somewhere in the 8th calendar year), a prisoner badly misbehaves and prison officials punish him by taking away all of his previously earned credit? Cf. 28 CFR §541.13 (2009) (prescribing sanctions for prohibited acts). Does the BOP retroactively adjust the duration of all of his administrative segments to 365 days so that the prisoner now finds himself in the middle of the 8th "administrative segmen[t]"? (Again we do not know if the BOP would find such a system administrable, and we doubt that this system would be more comprehensible to a prisoner.) If so, does the prisoner have a second opportunity to earn credit for good behavior for the 9th "administrative segmen[t]" that he had previously completed but now must account for again? Cf. §3624(b)(1) ("Credit that has not been earned may not later be granted"). Or, having previously awarded (and taken away) credit for that segment, are prison authorities left without any incentive to offer for good behavior?

Finally, the dissent, like petitioners, invokes the rule of lenity to support its interpretation. But, the best efforts of the dissent notwithstanding, we still see no "grievous ambiguity or uncertainty" that would trigger the rule's application. We remain convinced that the BOP's approach reflects the most natural reading of the statutory language and the most consistent with its purpose. Whatever the merits of the dissent's policy arguments, the statute does not require the BOP to accept them.

For all of these reasons, we conclude that the BOP's methodology is lawful. The Ninth Circuit's judgment is

*Affirmed.*

APPENDIX

**A fuller example of the BOP's method for calculat-
ing "credit for the last year or portion of a year of
the term of imprisonment"**

The defendant is sentenced to 10 years' imprisonment.
As a prisoner he exhibits exemplary behavior and is
awarded the maximum credit of 54 days at the end of each
year served in prison. At the end of Year 8, the prisoner
has 2 years remaining in his sentence and has accumu-
lated 432 days of good time credit. Because the difference
between the time remaining in his sentence and the
amount of accumulated credit (*i.e.*, 730 - 432) is less than a
year (298 days), Year 9 is the last year he will spend in
prison. (Year 10 has been completely offset by 365 of the
432 days of accumulated credit.) Further, Year 9 will be a
partial year of 298 days (the other 67 days of the year
being offset by the remainder of the accumulated credit).

Here is where the elementary algebra comes in. We
know that x, the good time, plus y, the remaining time
served, must add up to 298. This gives us our first equa-
tion: $x + y = 298$.

We also know that the ratio of good time earned in the
portion of the final year to the amount of time served in
that year must equal the ratio of a full year's good time
credit to the amount of time served in a full year. The
latter ratio is 54/365 or .148. Thus, we know that
$x/y = .148$, or to put it another way, $x = .148y$. Because we
know the value of x in terms of y, we can make a substitu-
tion in our first equation to get $.148y + y = 298$. We then
add the two y terms together $(1.148y = 298)$, and we solve
for y, which gives us $y = 260$. Now we can plug that value
into our first equation to solve for x (the good time credit).
If we subtract 260 from 298, we find that $x = 38$.

The offender will have to serve 260 days in prison in
Year 9, and he will receive 38 days additional good time

Appendix to opinion of the Court

credit for that time served. The prisoner's total good time is 470 days (432 + 38 = 470). His total time served is 3180 days.

As a final matter, while we have described the foregoing as the method to calculate credit for the portion of the last year to more transparently track the relevant statutory language, we note that the mathematical formula can be used to calculate the amount of maximum available credit for an entire sentence. Using the equations supplied above, if we divide the total number of days in a sentence by 1.148, we get the minimum number of days that a defendant must serve in that sentence. If we then subtract the number of days served from the total number of days in the sentence, we arrive at the maximum number of good time credit days the prisoner can earn. The statute, however, awards them on a yearly basis (but for the "last year or portion" thereof).

# SUPREME COURT OF THE UNITED STATES

---

No. 09–5201

---

## MICHAEL GARY BARBER, ET AL., PETITIONERS *v.* J. E. THOMAS, WARDEN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 7, 2010]

JUSTICE KENNEDY, with whom JUSTICE STEVENS and JUSTICE GINSBURG join, dissenting.

The Court has interpreted a federal sentencing statute in a manner that disadvantages almost 200,000 federal prisoners. See Pet. for Cert. 11, and n. 2. It adopts this reading despite the existence of an alternative interpretation that is more consistent with the statute's text. Absent a clear congressional directive, the statute ought not to be read as the Court reads it. For the Court's interpretation—an interpretation that in my submission is quite incorrect—imposes tens of thousands of years of additional prison time on federal prisoners according to a mathematical formula they will be unable to understand. And if the only way to call attention to the human implications of this case is to speak in terms of economics, then it should be noted that the Court's interpretation comes at a cost to the taxpayers of untold millions of dollars. See *id.,* at 11. The interpretation the Court adopts, moreover, will be devastating to the prisoners who have behaved the best and will undermine the purpose of the statute. These considerations, and those stated below, require this respectful dissent.

## I

The federal sentencing statute at issue here provides:

> "[A] prisoner who is serving a *term of imprisonment* of more than 1 year[,] other than a *term of imprisonment* for the duration of the prisoner's life, may receive credit toward the service of the prisoner's sentence, beyond the time served, of up to 54 days at the end of each year of the prisoner's *term of imprisonment*, beginning at the end of the first year of the term, subject to determination by the Bureau of Prisons that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations. . . . [C]redit for the last year or portion of a year of the *term of imprisonment* shall be prorated and credited within the last six weeks of the sentence." 18 U. S. C. §3624(b)(1) (emphasis added).

According to the Court, the phrase "term of imprisonment" must mean "time actually served" the third time that it appears in this particular subsection. But the Court gives the phrase a different interpretation the first two times it is used in the very same sentence. This in itself indicates that something is quite wrong here.

Petitioners invite the Court to read "term of imprisonment" to mean "the sentence imposed." This, too, seems unworkable. And it can be acknowledged that the Court's rejection of this interpretation is correct.

The choice, however, is not just between the Court's reading and that offered by petitioners. There is a third possibility, one more consistent with the statute than either of these two alternatives.

A fair reading of the statute, and a necessary reading to accomplish its purpose best, is to interpret the phrase "term of imprisonment" to refer to the span of time that a prisoner must account for in order to obtain release. The length of the term is set at the outset by the criminal sentence imposed. The prisoner earns release when that term has been fully completed. Most of the term will be

satisfied through time spent behind bars. Assuming the prisoner is well behaved, however, he may earn good time credits along the way; and those credits may substitute for actual prison time. Each year of the term comprises a full 365 days, which must be accounted for through a combination of prison time and credits. Thus conceived, a prisoner's "term" is the administrative period along which progress toward eventual freedom is marked.

Consider the Court's example of a prisoner subject to a ten-year sentence. See *ante*, at 2–4. The sentence is divided into ten 365-day segments. Each segment constitutes a year of the term. The prisoner will spend the first 365 days behind bars. In the statute's words, he has reached "the end of the first year of the term." Now is the time for credit to be awarded, and he may receive up to 54 days if sufficiently well behaved. Because he has already completed a full year of his term, those credits go toward completion of the next year. If, based on good behavior, he has earned the maximum of 54 days, he would need another 311 days behind bars before the second year of his term of imprisonment is at an end (because 54 + 311 = 365). If he has earned fewer than 54 days, a longer incarceration will be required to reach 365. Regardless, once the prisoner reaches the end of the second year of his term, he will again be eligible to receive good time credits.

This process repeats itself for the third year of the term, and so on. In the final year of his term (in this example, the tenth segment into which his term has been divided), the prisoner will receive credit in a prorated amount, to be awarded "within the last six weeks of the sentence." This ensures that the prisoner does not reach the end of year ten, only to find that he has just earned 54 days of credit he no longer needs.

The controlling rule is that each year of the prisoner's term—each of the ten administrative segments—comprises 365 days that must be completed through a

combination of service and credits. By combining actual prison time with the credits he has earned, a prisoner may complete a particular year of his term in less than 365 calendar days. As a result, credits may enable a well-behaved prisoner to complete his ten-year sentence before ten calendar years have elapsed. For a ten-year (3,650-day) sentence, a prisoner will serve 3,117 days behind bars if he earns a maximum of approximately 533 credits. This is 63 more days of credit than under the Court's reading—more than 6 additional credit days for every year of the sentence imposed.

Reading "term of imprisonment" this way is consistent with all parts of the statute. The prisoner receives his credit "at the end of each year of [his] term of imprisonment," a process that "begin[s] at the end of the first year of the term." Credit is only awarded if the prisoner has proven well behaved "during that year." This interpretation fulfills the "objective of §3624"—rewarding a prisoner for exemplary conduct during the preceding year. See *ante*, at 8.

This approach also has a textual integrity that the Court's reading does not: It gives "term of imprisonment" the same meaning each time it is used by the statute. Every time it appears in §3624(b)(1), "term of imprisonment" refers to the administrative period that a prisoner must complete in order to earn his freedom. The Court, by contrast, would read this phrase to mean "time actually served" the third time it is used, but "the sentence imposed" the first two times it is used ("'a prisoner who is serving a *term of imprisonment* of more than 1 year[,] other than a *term of imprisonment* for the duration of the prisoner's life'"). See *ante*, at 8–9. The Court's interpretation thus runs afoul of the "'presumption that a given term is used to mean the same thing throughout a statute.'" *Ante*, at 9 (quoting *Brown* v. *Gardner*, 513 U. S. 115, 118 (1994)). The inconsistency here is particularly

egregious because all three uses appear in the same sentence. See *id.,* at 118 ("[The] presumption [is] surely at its most vigorous when a term is repeated within a given sentence").

The Court responds by noting another part of the statute, a provision stating that prisoners shall receive clothing, money, and transportation "[u]pon the release of [the] prisoner on the expiration of the prisoner's term of imprisonment." §3624(d). A prisoner is released at the end of his actual time behind bars, says the Court, and so "term of imprisonment" must here refer to time actually served. Yet release also comes at the end of a prisoner's "term" in the sense described above—that is, when the balance of the sentence has been reduced to zero through a combination of prison time and good time credits. Indeed, this administrative use of the phrase fits well with the word "expiration," which in its most natural sense in this context refers to the close of a formal accounting period. See Black's Law Dictionary 619 (8th ed. 2004) ("A coming to an end; esp., a formal termination on a closing date"). By contrast, it is awkward at best to say, as the Court would have it, that a prisoner's actual time behind bars is something that "expires."

The Court's approach produces yet another oddity. The statute requires that prorated credit be awarded for "the last year or portion of a year of the term of imprisonment." One might naturally assume that the last year of a ten-year term would be year ten. That is how things work under the approach described above, in which a ten-year sentence is subdivided into ten administrative segments.

But under the Court's reading, a prisoner serving a ten-year sentence will never reach year ten of his term; year ten simply does not exist. According to the Court, year nine is the final year, and even year nine is not a full year: It lasts "no more than 298 days." *Ante,* at 3. If this sounds confusing, it will be all the more so to the prisoner

who has just received his sentence and turns to the statute books to figure out when to expect his freedom.

The Court does not even attempt to defend these flaws. Instead, it points to four supposed defects in the approach described above. None withstands examination.

First, the Court notes that the statute requires the release of a prisoner "upon 'the expiration of the prisoner's term of imprisonment, less any time credited' for good behavior." *Ante*, at 15 (quoting §3624(a)). But if "term of imprisonment" truly refers to the entire span that a prisoner must complete to earn his freedom—a period that accounts both for actual time and for good time credits— then why would the "less any time credited" language be appropriate? The answer is that this provision—which appears at the very beginning of the section entitled "Release of a prisoner"—announces to a prisoner when release may be expected: when the prisoner's term expires, taking into account credit days "as provided in subsection (b)." §3624(a) (bold face deleted). This use of language is common. A debtor who says "I will write a check for what I owe you, less what you owe me" is simply saying "I will pay what I owe, taking into account your debts to me." Perhaps the same meaning could have been conveyed using different words, but this is hardly probative.

Second, the Court alleges that the above approach conflicts with the statute's requirement that credit be awarded "at the end of each year" based upon behavior "during that year." After all, if a year of the term can be satisfied in part through credit, then it may last less than a full calendar year. Yet the statute does not require that credit be awarded at the end of a calendar year for good behavior during a calendar year. What it requires is that credit be awarded "at the end of each year of the prisoner's term of imprisonment" for good behavior "during that year." And this is precisely what the above approach does.

Third, the Court frets that, under the approach above,

prisoners will earn credit at different rates during a single sentence. It admonishes that "[t]he use of different rates finds no support in the statute." *Ante*, at 16. This response is telling. The statute, in fact, prescribes no particular rate—and certainly no formula based on a rate—except as embodied in one clear directive: Prisoners are eligible to earn "up to 54 days at the end of each year of the prisoner's term of imprisonment." As to that command, the above approach is perfectly faithful.

Fourth, the Court suggests that the above approach causes credit to vest immediately, contrary to the statute. Again, this is not true. As per the statute, credit only vests "on the date the prisoner is released from custody," §3624(b)(2), meaning that it can be revoked at any time before that date. This gives prisoners approaching their release date an extra incentive to behave.

As a fallback, the Court wonders what would happen if a prisoner misbehaved on the final day of his ten-year sentence. Would the Bureau of Prisons (BOP) be forced to "retroactively adjust the duration of all of his [term years] to 365 days"? *Ante*, at 17. The answer is what one might suppose: A prisoner whose credits are revoked will find himself precisely where he would have been if those credits had never been earned. All years of the term remain 365 days, as they always have. But a misbehaving prisoner who had formerly earned, say, 500 credits will find himself without the benefit of those 500 days. That will leave him with more of his term to complete—500 days more, to be precise. If he behaves well again, he can resume earning credit for the remainder of his term, but he has lost the opportunity to earn credits for any prior years. See §3624(b)(1). This is not at all confusing for a prisoner; and certainly it is as straightforward, if not more so, than the Court's approach. The Court's view causes a prisoner's "term of imprisonment" to shrink over time according to an algebraic formula, only to expand again if he misbe-

haves.

Finally, the Court speculates that BOP might find the above approach difficult to administer. The Court identifies no basis for this claim, nor does one exist. The information used to calculate a prisoner's term under the above approach is the same as it is under the Court's approach. True, a prisoner may become eligible to be awarded credit on different calendar days during the course of his term. But under the Court's approach, this also happens when awarding credit in the final year. And, it goes without saying, federal prisoners begin their incarceration on different calendar days anyway, so that under any approach, BOP will be forced to evaluate prisoners throughout the calendar year.

## II

The Court's reading of §3624(b)(1), therefore, is less consistent with the text than the reading explained above. But even if these interpretations were in equipoise, under any fair application the rule of lenity should tip the balance in petitioners' favor. When a penal statute is susceptible of two interpretations, the one more favorable to the defendant must be chosen unless "text, structure, and history . . . establish that the [harsher] position is unambiguously correct." *United States* v. *Granderson*, 511 U. S. 39, 54 (1994). Resolving ambiguity in favor of lenity ensures that statutes provide "fair warning[,] . . . in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States* v. *Bass*, 404 U. S. 336, 348 (1971) (internal quotation marks omitted). The rule thus applies "not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose." *Bifulco* v. *United States*, 447 U. S. 381, 387 (1980).

The Court assumes without deciding that §3624(b) is penal in nature. See *ante*, at 13. No assumption is neces-

sary: The statutory provision awarding good time credits "in fact is one determinant of [a] prison term," so that a prisoner's "effective sentence is altered once this determinant is changed." *Weaver* v. *Graham*, 450 U. S. 24, 32 (1981). In *Weaver*, the Court considered whether an amendment to Florida's statutory formula for calculating good time credits implicated the *Ex Post Facto* Clause. The Court concluded that it did, as the new statute "substantially alter[ed] the consequences attached to a crime already completed, and therefore change[d] 'the quantum of punishment.'" *Id.,* at 33 (quoting *Dobbert* v. *Florida*, 432 U. S. 282, 294 (1977)). For the same reason, the penal effect of §3624(b)(1) is substantial enough to implicate the rule of lenity. We should not disadvantage almost 200,000 federal prisoners unless Congress clearly warned them they would face that harsh result.

## III

The Government—although not the Court—argues that we should embrace its interpretation out of deference to BOP. BOP has been charged by the Attorney General with responsibility for "[a]pproving inmate disciplinary and good time regulations." 28 CFR §0.96(s) (2009). BOP has long followed the same credit-calculation method now advocated by the Court. The Government argues that we should defer to BOP's choice as a permissible exercise of its delegated responsibility.

This argument fails on multiple levels. There is no indication that BOP has exercised the sort of interpretive authority that would merit deference under *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). The statute does not create a legislative gap for BOP to fill. To the contrary, the procedures that govern the timing of credit awards are spelled out in great detail. Cf. *Lopez* v. *Davis*, 531 U. S. 230, 241–242 (2001) (where statute says that BOP "may" grant early

release to certain prisoners, without specifying further criteria, Congress deliberately created a "statutory gap"). The statute even goes so far as to explain what to do "[i]f the date for a prisoner's release falls on a Saturday, a Sunday, or a legal holiday." §3624(a). This legislative specificity as to timing contrasts with other provisions that do delegate authority to BOP. *E.g.,* §3624(b)(1) (awarding of credit is "subject to determination" by BOP that the prisoner "has displayed exemplary compliance with institutional disciplinary regulations").

BOP has not claimed that its view is the product of any "formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement" with the force of law. *United States* v. *Mead Corp.*, 533 U. S. 218, 230 (2001). In 2005, BOP made final an administrative rule adopting its preferred methodology. 70 Fed. Reg. 66752 (adopting 28 CFR §523.20). But when pressed during an earlier stage of this litigation, BOP conceded that it had "failed to articulate in the administrative record the rationale upon which it relied when it promulgated" the rule. *Tablada* v. *Thomas*, 533 F. 3d 800, 805 (CA9 2008). The Court of Appeals accepted BOP's concession, *ibid.*, and that aspect of its ruling has not been appealed.

As a fallback position, the Government argues that BOP's interpretation should receive at least some deference under *Skidmore* v. *Swift & Co.*, 323 U. S. 134 (1944). But under *Skidmore*, an agency decision only merits "respect proportional to its 'power to persuade.'" *Mead*, *supra*, at 235 (quoting *Skidmore*, *supra*, at 140). BOP's position is of long standing, but the administrative record is noteworthy for what it does not contain—namely, any reasoned justification for preferring BOP's methodology over statutorily permissible alternatives. BOP has consistently adhered to its mistaken belief that its approach is the only one that can be squared with the text. See 62

Fed. Reg. 50786 (1997) (explanation to interim rule asserting that the correct methodology "had been clearly stated by statute since the implementation of the Sentencing Reform Act of 1984"). For example, at no point did BOP consider, much less consciously reject, the interpretation outlined here. Cf. *Reno* v. *Koray*, 515 U. S. 50, 60–61 (1995) (deferring to BOP's reasoned decision to reject one interpretation in favor of another). An agency need not consider all possible alternatives. But deference is not owed to an agency view, however consistently held, that from the start has been premised on legal error. See *Mead*, *supra*, at 228; *Skidmore*, *supra*, at 140.

\* \* \*

The straightforward interpretation urged here accords with the purpose of the statute, which is to give prisoners incentive for good behavior and dignity from its promised reward. Prisoners can add 54 days to each year. And when they do so, they have something tangible. In place of that simple calculation, of clear meaning, of a calendar that can be marked, the Court insists on something different. It advocates an interpretation that uses different definitions for the same phrase in the same sentence; denies prisoners the benefit of the rule of lenity; and caps off its decision with an appendix that contains an algebraic formula to hang on a cell wall.

To a prisoner, time behind bars is not some theoretical or mathematical concept. It is something real, even terrifying. Survival itself may be at stake. See Dept. of Justice, Bureau of Justice Statistics, C. Mumola, Suicide and Homicide in State Prisons and Local Jails (NCJ 210036, Aug. 2005), online at http:// bjs.ojp.usdoj.gov/content/pub/pdf/shsplj.pdf (all Internet materials as visited June 2, 2010, and available in Clerk of Court's case file) (prison homicide rates); National Prison Rape Elimination Commission Re-

port, p. 4 (June 2009) (citing a national survey estimating that 60,500 state and federal prisoners had been sexually abused during the preceding year). To this time, the Court adds days—compounded to years. We should not embrace this harsh result where Congress itself has not done so in clear terms. I would reverse the judgment of the Court of Appeals.